# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**QUANTA SERVICES, INC.**
**Employer Below, Petitioner**

**FILED**
**May 1, 2023**

EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**vs.)    No. 22-ICA-244      (JCN: 2021018967)**

**ZACHARY BOLLING**
**Claimant Below, Respondent**


### MEMORANDUM DECISION

Petitioner Quanta Services, Inc. ("Quanta Services") appeals the order of the Worker's Compensation Board of Review ("Board") dated October 3, 2022, that reversed the claim administrator's order dated May 19, 2021. Respondent Zachary Bolling filed a timely response.[1] Quanta Services did not file a reply. The issue on appeal is whether the Board erred in reversing the claim administrator, holding the claim compensable for electrical shock and sequelae of electrical shock, and remanding the claim back to the claim administrator to address temporary total disability ("TTD") and other benefits.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' briefs and oral argument, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the Board's order is appropriate under Rule 21 of the Rules of Appellate Procedure.[2]

On March 10, 2021, Mr. Bolling, a groundman for Quanta Services, was working with a crew repairing an electrical transmission line tower. The crew was in the process of lowering the electrical transmission ("power") line from the tower so that it could eventually be disconnected. One worker was in the bucket of the truck at the top of the tower, while Mr. Bolling and three other workers were on the ground at the bottom of the tower. The power line was grounded to the tower structure and was tested for voltage which gave a reading of zero volts. The ground wire to the tower was not long enough for the

---

[1] Petitioner is represented by Daniel G. Murdock, Esq. Respondent is represented by Kelly Elswick-Hall, Esq.

[2] The Court acknowledges that this matter was presented for oral argument on February 28, 2023, pursuant to Rule 19 of the Rules of Appellate Procedure.

1

power line to be lowered all the way to the ground, so a new ground wire was attached from the power line to a new grounding rod driven into the ground, and the ground to the structure was removed. There is a dispute about the depth the grounding rod was driven into the ground.

Mr. Bolling and the three other workers below, including his immediate foreman, Freddie Ray Boggs, took hold of the power line and were maneuvering it into position in order to attach a grip to the power line to anchor the line to a bulldozer. According to Mr. Boggs, Mr. Bolling was the closest worker to the grounding rod and was holding both the power line and a rigging cable with a large grip attached to it, which was connected to a steel choker on the nearby dozer. Mr. Bolling was the only crewmember who was holding both the power line and the rigging cable. According to Mr. Boggs, and Jason Bryant, a crewmember, one of the crew told Mr. Bolling to let go of the power line, but he could not; he tensed up and collapsed on the ground.

Mr. Bolling lost consciousness and was not breathing. One of his co-workers began CPR while Mr. Boggs ran to the truck and got the automated external defibrillator ("AED"), which is kept on these worksites due to the risk of electric shock and cardiac arrest. The AED was placed on Mr. Bolling's chest and detected that he needed a shock, so a shock was deployed. Mr. Bolling began to take very shallow breaths and gasps of air but remained unconscious. Mr. Bolling was then transported by helicopter to Charleston Area Medical Center ("CAMC").

Later that day, Mr. Boggs returned to the site to secure the power line the crew was working on. When he grabbed the power line that was still attached to the grounding rod, Mr. Boggs was shocked. The power line was then tested and showed 600 volts of power, even though it was still connected to the same grounding rod.[3] After this incident, the crew moved the grounding rod to the base of the structure, which was determined to be a lower impedance path to the ground, and the crew was able to get a 0v reading on the conductor at that time and prior to the start of work the next day.

The next day, on March 11, 2021, an incident investigation report was completed by AEP Transmission, indicating that Mr. Bolling and his work crew were tasked with moving a 345kv conductor which had been de-energized and grounded. There were three crew members, two were holding onto the conductor while a third was tasked with installing a grip. Approximately thirty seconds into assisting with the catching of the

---

[3] Mr. Boggs told the AEP representative on site, Josh Fisher, that someone needed to call the hospital and inform medical personnel that Mr. Bolling may have been shocked. However, nobody called the hospital to inform them, and it was not until sometime after multiple diagnostic tests were completed, trying to identify the root cause of Mr. Bolling's episode, that it was revealed he might have been shocked.

conductor, one crewmember (Mr. Bolling) began to show symptoms of a seizure. Later that day, it was discovered that although the power line was supposedly grounded, there was a measurable amount of induced voltage (500v-600v) on the grounded conductor where the crew had been working. Nevertheless, although the report concluded that Mr. Bolling could have been negatively affected by the presence of induced voltage on the conductor, that it was unlikely, as there were at least two other crew members in contact with the conductor a few feet away who were not affected.

From March 10, 2021, to March 16, 2021, Mr. Bolling was examined by numerous medical personnel. During this time period, it was unclear what caused Mr. Bolling to experience his episode on the date of injury, since it was believed that the power line was grounded and Mr. Bolling could not have sustained an electric shock. Neither Mr. Bolling nor his medical providers were aware that shortly after Mr. Bolling's episode, it was discovered that the power line was still energized and there was actual potential for an electrical shock.[4] Numerous doctors stated that they believed it was seizure like and could have been caused by the medications he was taking at the time. Notably, on March 13, 2021, Mr. Bolling was seen by Carl Musser, Jr., M.D., a cardiac electrophysiologist. Dr. Musser at that time stated that "[p]atient's syncope very concerning for primary arrythmia issue as I do not believe he was electrocuted." Further, Dr. Musser's assessment stated, "[h]istory and symptoms are suggestive of possible seizure activity, especially given that bystanders noticed that he was shaking and foaming at the mouth. Again, neither Mr. Bolling nor his medical providers were aware of the real potential for an electric shock until after Mr. Bolling returned to work in April 2021, when he was advised by a co-worker that voltage had been discovered on the line hours after his episode. Once Dr. Musser learned about that voltage on the line, he determined that Mr. Bolling had suffered an electrical shock on the day of the incident.

By order dated May 19, 2021, the claim administrator denied Mr. Bolling's claim on the basis that he did not suffer an injury in the course of and resulting from his employment. On October 27, 2021, Mrs. Bolling signed an affidavit, and on December 21, 2021, she was deposed. She stated, among other things, that after regaining consciousness, Mr. Bolling indicated "that he was shocked and felt it go into his left finger and he had his left elbow on the line." Notably, Mrs. Bolling also stated that she continued to text Mr. Bolling's employer while he was hospitalized to keep them updated on his care and prognosis, and at the request of Mr. Bolling's medical providers to obtain details about the accident to help with their diagnosis. Three days after the injury, she told them that they were waiting on an MRI, and that doctors were concerned because they could not figure out why a healthy twenty-five-year-old's heart would just stop. Two days later, she again

_____

[4] Although electric shock and electrocution are often used synonymously, by both lay people and physicians, electrocution is generally reserved for electric shocks resulting in death.

3

texted Mr. Bolling's employer to say that doctors had conducted multiple diagnostic tests but could not find any answers. Because the doctors could not find any structural reasons for the cardiac event, Mr. Bolling's cardiologist, Dr. Musser, surgically implanted a cardiac loop recorder to capture any future cardiac events in hopes of determining the source of Mr. Bolling's episode. Mrs. Bolling informed the employer that this surgery was going to take place, and specifically mentioned that the doctors kept asking if they were sure there was no possibility that Mr. Bolling was shocked, because that was the only explanation that made sense.

In Dr. Musser's affidavit, dated November 29, 2021, he explained that he was told on the day of the event that Mr. Bolling could not have been electrocuted, so he performed a significant amount of testing in an effort to determine the source of Mr. Bolling's cardiac and respiratory arrest. However, those tests revealed no structural explanation, so Dr. Musser implanted the loop recorder, but it did not record any life-threatening arrhythmias that could explain the event. Once Dr. Musser was informed that, in fact, there had been 600 volts on the power line, and given the lack of any structural abnormality or significant medical history that might explain Mr. Bolling's episode, Dr. Musser concluded that Mr. Bolling sustained an electric shock on March 10, 2021, causing his cardiac and respiratory event.

Chuan Fang Jin, M.D., reviewed Mr. Bolling's medical records at the request of Quanta Services. In her June 6, 2022, report, Dr. Jin noted, among other things, that cardiac injury due to electrocution would result in heart injury and would be indicated by cardiac enzyme elevation and ventricular arrythmias that are not present in this case. Dr. Jin also noted that Vyvanse and Phentermine are both stimulants that can cause seizures, and if taken with Lexapro can increase serotonin levels, which can increase seizure activity. Thus, Dr. Jin concluded that the most likely etiology of Mr. Bolling's event on March 10, 2021, was a seizure that caused cardiac arrythmia/arrest.

On October 3, 2022, the Board reversed the claim administrator and found that the preponderance of evidence established that Mr. Bolling sustained an electrical shock in the course of and resulting from his employment. The Board, as the trier of fact in this matter, determined that Dr. Musser, a cardiac electrophysiologist, was clearly the most qualified to address the etiology of Mr. Bolling's heart distress, and thus it adopted Dr. Musser's opinion that Mr. Bolling had most likely experienced and electric shock in the course of and resulting from his employment. The Board ordered the claim be held compensable for electrical shock and its sequelae and remanded the claim to the claim administrator to address TTD and other benefits. It is from that order that Quanta Services now appeals.

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

4

The Intermediate Court of Appeals may affirm the order or decision of the Worker's Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Worker's Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:

(1) In violation of statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the Board of Review;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion

On appeal, Quanta Services argues that the Board's order is premised entirely on the speculative and plainly unreliable opinion of Dr. Musser, is arbitrary and capricious in its weighing of the evidence, and blatantly disregards the evidence, which it argues establishes that Mr. Bolling did not sustain a workplace injury. Thus, Quanta Services argues that the Board's order is noncompliant with the requirements of West Virginia Code § 23-4-1g, which requires that decisions be made upon a preponderance of the evidence standard and discards the rule of liberality in the adjudication of workers' compensation disputes.[5]

Specifically, Quanta Services argues that the medical evidence of record fails to establish any indication of electrical injury, and the scientific evidence establishes that Mr.

---

[5] West Virginia Code § 23-4-1g (2003), provides in pertinent part that:

[R]esolution of any issue raised administering this chapter shall be based on a weighing of all evidence pertaining to the issue and a finding that a preponderance of the evidence supports the chosen manner of resolution. The process of weighing evidence shall include, but not be limited to, an assessment of the relevance, credibility, materiality and reliability that the evidence possesses in the context of the issue presented. Under no circumstances will an issue be resolved by allowing certain evidence to be dispositive simply because it is reliable and is most favorable to a party's interests or position. If, after weighing all of the evidence regarding an issue which a claimant has an interest, there is a finding that an equal amount of evidentiary weight exists favoring conflicting matters for resolution, the resolution that is most consistent with the claimant's position will be adopted.

Bolling could not have sustained an electrical injury under the circumstances present on March 10, 2021. First, Quanta Services argues the Board failed to provide any meaningful analysis of the evidence that Mr. Bolling was taking Phentermine, Lexapro and Vyvanse, as well as occasional medical marijuana use at the time he collapsed. Second, Quanta Services argues that the Board failed to address the issue of the lack of entry and exit wounds, which it asserts would be present if Mr. Bolling had been electrocuted. Lastly, Quanta Services argues that the scientific evidence of record from AEP and John Averett, clearly establishes that Mr. Bolling could not have received an electric shock on March 10, 2021.

Quanta Services' argument about the combination of medications Mr. Bolling was taking at the time of injury is without merit. Upon Mr. Bolling's arrival to the emergency room it was unclear whether he was still taking Phentermine, Lexapro, and Vyvanse.[6] However, Mrs. Bolling's affidavit is clear that he was no longer taking Phentermine at the time of the work-related injury.[7] Further, once Dr. Musser became aware of the voltage remaining on the line after Mr. Boggs returned to the site and was himself shocked, Dr. Musser opined that, based on Mr. Bolling's medical history and the various diagnostic tests conducted which effectively ruled out various other potential causes for Mr. Bolling's episode, Mr. Bolling had sustained an electric shock.

Additionally, Quanta Services' argument about the lack of apparent entry/exit wounds from electrical shock is not dispositive. In fact, Dr. Musser, as the Board found, was the most qualified physician of record and knew Mr. Bolling's physical injury and lack of entry/exit wounds, and yet Dr. Musser opined that an electrical shock took place. The Board was not clearly wrong finding Dr. Musser to be the most qualified physician. Moreover, it is generally known that electrical burn entry and exit wounds are not always evident. A prime example is Mr. Boggs receiving an electrical shock later on the day of the incident, from the same line Mr. Bolling was holding on to, and Mr. Boggs did not have entry/exit wounds. Whether an individual has electrical burn entry and exit wounds can be different for each person and dependent on a variety of factors, including but not limited to, type of current (amperage), voltage, duration of exposure, and body resistance. [8]

---

[6] Phentermine is for weight loss. Lexapro is an anxiety medication and Vyvanse is for attention deficit hyperactivity disorder (ADHD).

[7] Mrs. Bolling asserted, "[a]fter he was released from the hospital, we contacted the clinic where he went for weight loss in the past and found out that, in reality, he had not been recently prescribed any weight loss medication."

[8] "Electrical burn entry and exit wounds can vary between every individual and will not always be apparent. *See* Daniel P. Runde, *Electrical Injuries*, MSD Manual Professional Version (Sept. 2022), Electrical Injuries - Injuries; Poisoning - MSD Manual Professional Edition (msdmanuals.com); *see also* Christina Beutler, Electrocution:

Lastly, the AEP investigation and Quanta Services expert, John Averett, both had doubts in their opinions about whether or not Mr. Bolling had sustained an electric shock. On the one hand, the AEP report concluded that Mr. Bolling could have been negatively affected by the presence of induced voltage on the conductor, although, it was unlikely, as there were at least two other crew members in contact with the conductor a few feet away who were not affected.[9] Mr. Averett also stated, "[b]ecause this same scenario [a charge on the line] could not be replicated the following morning *[it] raises a question in my mind of whether or not there was a detectable voltage on the line at the time of the incident.*" (Emphasis added). At a minimum, this suggests that both AEP and the engineering expert were equivocal about the electric shock potential at the time of Mr. Bolling's episode. Thus, the Board was not clearly wrong in determining that a preponderance of the evidence establishes that Mr. Bolling sustained an electric shock in the course of and resulting from his employment.

Upon review, we find no error in the Board's order dated October 3, 2022. The record contains no evidence that Mr. Bolling had any prior history of heart issues. Further, once Dr. Musser eventually became aware that there was still voltage on the line later on the day of the incident, he concluded Mr. Bolling had sustained an electric shock. In Dr. Musser's affidavit, dated November 29, 2021, he explained that he was told on the day of the event that Mr. Bolling could not have sustained an electric shock, so he performed a significant amount of testing in an effort to determine the source of Mr. Bolling's cardiac/respiratory compromise. However, those tests revealed no structural explanation, so Dr. Musser surgically implanted a loop recorder, but it did not record any life-threatening arrhythmias that could explain the event. Once Dr. Musser was informed that there had been 600 volts on the line hours after the incident, and the lack of other structural abnormality or significant medical history, Dr. Musser made a differential diagnosis and concluded that Mr. Bolling sustained an electric shock causing his cardiac and respiratory event on March 10, 2021.

This Court notes the need for employers in workers' compensation claims to provide medical providers and claimants or their families with information about which they are aware concerning the cause and circumstances resulting in an injury, particularly when such information may be relevant to diagnosis and treatment. In the case *sub judice*, it

Prehospital Care of Electrical Burns (March 29, 2018), [Electrocution: Prehospital Care of Electrical Burns - EMT Training Base](Electrocution: Prehospital Care of Electrical Burns - EMT Training Base).

[9] Notably, the report also states "[c]ontractor employees have suggested that underlying medical conditions may have caused" Mr. Bolling to collapse on the job site, but also notes a lack of information about the type and condition of [the employees] respective hand protection.

appears that Quanta Services failed to timely provide information to Mr. Bolling's family, or his medical providers related to Mr. Bogg's electrical shock. They only learned this information when Mr. Bolling returned to work in April and was informed by a co-worker that Mr. Boggs had been shocked by the same power line later on the day of the incident. Consequently, Mr. Bolling arguably underwent additional diagnostic testing resulting in added costs, delayed diagnosis and treatment, and delay in his return to work, which are inconsistent with the purpose and goals of the workers' compensation act, which include: 1) receipt of proper and timely medical treatment; 2) return to work at earliest possible time; and 3) prompt, fair compensation to the injured worker. *Hammons v. West Virginia Office of Ins. Com'r*, 235 W. Va. 577, 585-588, 775 S.E.2d 458, 466-469 (2015) ("one of the essential purposes of the Workmen's Compensation Act as conceived by the Legislature…is to provide a simple and expeditious method of resolving the question of disputed claims arising from injuries occurring in the workplace.") (Citation omitted); *see* W. Va. Code §§ 23-4-3a (2005), 23-4-7b (2008), and 23-5-13 (2021).

The irony of the situation in this case is that as a result of Quanta Services failure to provide the Bolling's and/or Mr. Bolling's medical providers with complete, updated information, Dr. Musser conducted a more exhaustive investigation, including extensive testing, having multiple consults, and even implanting a cardiac monitor in an effort to identify the cause of Mr. Bolling's cardiac event. Dr. Musser effectively ruled out all other possible causes, leaving electrical shock during employment as the only reasonable cause of Mr. Bolling's cardiac event, providing further evidentiary support for the Board's decision.

Accordingly, we affirm the Board's order dated October 3, 2022.

Affirmed.

**ISSUED:** May 1, 2023

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Thomas E. Scarr
Judge Charles O. Lorensen

8